Present:  All the Justices

VIRGINIA ELECTRIC AND POWER COMPANY

v.  Record No. 982485    OPINION BY JUSTICE ELIZABETH B. LACY
                                        September 17, 1999
JAMES DUNGEE, A MINOR, ETC.

FROM THE CIRCUIT COURT OF CHARLES CITY COUNTY
Thomas B. Hoover, Judge

James A. Dungee, a minor (James or the plaintiff), by his next friend, filed a motion for judgment against Virginia Electric and Power Company (Virginia Power) seeking damages for burns he sustained while he was in a Virginia Power substation and came in contact with 13,200 volts of electricity.  James alleged that Virginia Power was negligent in failing to properly install, maintain, and inspect the fence surrounding the substation.  Virginia Power denied that it was negligent and asserted the affirmative defenses of contributory negligence and assumption of risk.  A jury returned a verdict in favor of James in the amount of $20,000,000.  The trial court denied Virginia Power's motion to set aside the verdict or order remittitur and entered judgment on the jury's verdict.  Virginia Power filed an appeal assigning error to a number of rulings of the trial court.  Because we find no error in these rulings, we will affirm the judgment of the trial court.

I.  Facts and Material Proceedings

At the time of the accident, James was a 10-year-old boy who had just completed the fourth grade. According to the testimony of Ella Langford, a clinical social worker, and Dr. Thomas K. Tsao, a child psychiatrist, James suffered from attention deficit hyperactivity disorder (ADHD). Langford testified that ADHD is characterized by impulsivity, inattention, distractibility, and hyperactivity. She also testified that at the time of the accident, James was in the childhood development stage commonly referred to as "latency," which she described as the stage when children learn to make decisions about their safety and cease to need to be watched constantly by their parents. She testified that the latency stage is influenced by ADHD because teachers' and parents' instructions to the child concerning limitations on what he should or should not do often do not register in the child's mind.

Dr. Tsao testified that James had above average intelligence but that his intelligence, as well as his perception, maturity, and judgment were impaired by ADHD.

James lived in an apartment complex in the City of Richmond. Next to the outdoor common area for the complex was an electric substation owned and operated by Virginia Power. The substation was surrounded by a chain-link fence approximately six-feet high and topped with a one-foot

2

extension of three strands of barbed wire. The gate to the fence was locked at all times. Signs on the fence stated "Danger High Voltage." Earl Maxwell, a resident of the apartment complex, testified that in the year prior to the accident, he had observed no warning signs on any of the equipment inside the substation. He testified that, on the side of the substation facing the apartment complex, there were two or three "gaps" or holes under the fence which were large enough for a child to crawl through.

Over a month before the accident, Captain Timothy Zack, an officer in the United States Army who lived in an apartment overlooking the substation, told a Virginia Power employee working at the substation that he had seen children playing in the substation. Captain Zack also showed the Virginia Power employee one of the holes or gaps under the fence and warned that "somebody is going to get injured."

A Virginia Power substation inspector, Edwin Lee Thompson, testified that he inspected the substation two weeks before the accident. He saw "kids and stuff" around the substation and gaps between the bottom of the fence and the ground on the side of the substation facing the apartment complex. Thompson, however, did not report the holes and testified that they were not large enough for a "person" to get through.

On July 21, 1996, James and two of his friends, Ken McMickens and Kevin Clayton Adams, Jr., were playing with a ball in the common area.  Ken and Kevin were 9 and 11 years old, respectively.  While they were playing, the ball went over the fence surrounding the substation.  There is conflicting testimony as to what occurred after that.

James testified that he crawled under the fence at one of the holes or gaps between the bottom of the fence and the ground while Kevin helped him by holding the fence up.  Kevin testified that James entered the substation by climbing on top of a green cable box near the fence, placing his hands and one foot on the fence and "leap[ing]" over the top.  According to Ken, James did not use the green cable box, but climbed up the fence using his hands and feet, stood on the barbed wire, and then jumped down.  Captain Zack was working on his car nearby at the time of the accident.  He testified that he saw a boy climb under the fence as another boy moved the fence "back and forth."

James testified that he does not remember what he did once he entered the substation.  Ken testified that James "started touching wires and he went over to the power surge and he touched — he climbed on something and touched something, and we seen a bright light and he was laying on the ground."  Kevin testified that James touched some wires that

4

did not affect him but then went and touched another wire, whereupon it "started electrocuting him with one hand, and he tried to pull it off."

Ken testified that he told James not to enter the substation because he could get electrocuted, and that once inside the substation James asked, "'You all dare me to touch this wire over here[?]'"

Kevin first testified that he said nothing to James before James entered the substation and that James did not suggest a dare to anyone. He testified that the only conversation he had with James occurred when he told James that he "might get hurt" when James was about to touch "some high voltage [wires]," to which James replied, "'No, you're lying.'" Later, after having been read testimony from his deposition, Kevin agreed that, prior to James' entering the substation, he told James to "'Hurry up and get out'" and that, once inside, James said, "'You dare me to touch the wires?'" Kevin further agreed that after James first touched the wires and was not hurt, James said, "'I'm going to touch that one,'" to which Kevin replied, "'No, James, it's going to electrocute you,'" to which James responded, according to Kevin, "'No, man, you don't know what you're talking about.'"

Captain Zack testified that he could hear what the children were saying, and that he did not hear any of the

5

children give any warnings or any child asking to be dared to do anything.

Kevin's father, Kevin Clayton Adams, Sr., testified that he heard a loud bang and saw a puff of smoke inside the substation. He climbed the substation's gate and ran to James' body. He testified that James' eyes and hair were burnt, that his shoes were just about melted, and that skin fell off of James' body onto Mr. Adams' clothes as he carried James out of the substation. He testified that James was conscious and began screaming before he set him down.

James received third degree burns over 25% of his body including his face, chest, and arms. He was treated at no charge at the Shriners Hospital. Surgical procedures to restore skin lost as a result of the accident have left permanent scarring and disfigurement and will require future surgical procedures and extensive physical and psychological therapy.

In the motion for judgment, James alleged that Virginia Power, as a producer of electricity, owed a high degree of care for the safety of those persons coming into contact with the substation. The motion for judgment also alleged that Virginia Power had actual or constructive knowledge that children regularly played in or around the substation, and that Virginia Power negligently erected, maintained, and

6

inspected the fence in violation of its duty of care and in violation of recognized industry standards. James sought $750,000,000 in compensatory damages and $750,000,000 in punitive damages but later dropped the punitive damage claim.

The motion for judgment was filed in Charles City County. Virginia Power filed a motion to transfer venue to the City of Richmond, which the trial court denied. During a five-day trial, the jury heard the testimony of twenty witnesses and returned a verdict in favor of James. Virginia Power appealed assigning error to a number of the trial court's rulings, including the denial of Virginia Power's motion for a change of venue, refusal to find the plaintiff contributorially negligent as a matter of law, refusal to give Virginia Power's offered jury instruction on the duty owed to a trespasser, the inclusion of the term "maturity" in jury instructions on contributory negligence, refusal to allow certain expert testimony, and refusal to set aside the verdict or award Virginia Power remittitur. We consider these issues in order.

## II.  Venue

Virginia Power first assigns error to the trial court's denial of its motion to transfer the action from Charles City County to the City of Richmond. Virginia Power contends that although Charles City County is a permissible venue under Code § 8.01-262(3) because it conducts business there, application

7

of the principles set out in <u>Norfolk & Western Railway Co. v.</u> <u>Williams</u>, 239 Va. 390, 389 S.E.2d 714 (1990), required that the action be transferred because Charles City County has no practical nexus with the litigation.  We disagree.

For negligence cases, among others, the Code of Virginia provides a plaintiff with a choice of forums in which an action can be brought.  Code § 8.01-262.  However, Code § 8.01-265, the so-called <u>forum</u> <u>non-conveniens</u> statute, allows the transfer of any action, even if it was originally filed in a proper venue, to "any fair and convenient forum" in the Commonwealth upon a motion by the defendant and "for good cause shown."  Code § 8.01-265.  "Good cause" under the statute includes, but is not limited to, "the avoidance of substantial inconvenience to the parties or the witnesses." <u>Id.</u>  Whether to grant such a motion is within the discretion of the trial court, and the trial court's denial of the motion will not be reversed absent an abuse of that discretion. <u>Williams</u>, 239 Va. at 392, 389 S.E.2d at 715.

To secure a change in venue, Virginia Power had the burden of showing that there was good cause to transfer the case from Charles City County to the City of Richmond.  In ruling on Virginia Power's motion, the trial court considered the impact on the witnesses and parties of holding the trial in Charles City County, as compared with holding it in

Richmond.  It concluded that traveling thirty miles to Charles City County from Richmond imposed minimal cost and inconvenience on those parties and witnesses who lived in Richmond, and that holding the trial in Charles City County would not impose any material inconvenience on witnesses coming from other areas of the country because the Richmond airport is located midway between Richmond and Charles City County.  The court also concluded that there was no evidence that overnight stays in Charles City County would be required for those witnesses who lived in Richmond.  Based on these factors, the trial court concluded that traveling thirty miles imposed minimal inconvenience and that there was no showing of substantial inconvenience to the parties or witnesses.

Virginia Power argues that the test for good cause is not exclusively substantial inconvenience.  According to Virginia Power, our decision in Williams established that "a trial court abuses its discretion under Va. Code § 8.01-265 if it declines to transfer venue from a forum with no practical nexus to the cause of action to a more convenient forum with a strong nexus."  We agree with Virginia Power that Code § 8.01-265 does not limit the definition of "good cause" to "the avoidance of substantial inconvenience to the parties or the witnesses;" however, we disagree with Virginia Power's characterization of our holding in Williams.

The plaintiff in Williams was an employee of a railroad company based in Roanoke. He was injured when he fell from a chair in his office in Roanoke. He filed a personal injury action against the railroad company in Portsmouth, a permissible venue. The information before the trial court relevant to the question of transfer was that all the witnesses were from Roanoke and they all "faced the inconvenience of being away from families, homes, and jobs while traveling to Portsmouth to testify, . . . ." 239 Va. at 395, 389 S.E.2d at 717. Given the location of the parties and witnesses as well as the accident itself, we concluded that the litigation had "no practical nexus" with Portsmouth but had "a strong nexus" with Roanoke. Id. at 396, 389 S.E.2d at 717. However, contrary to Virginia Power's contention, the degree of the "nexus" does not alone provide the good cause required for transfer under the statute.

In Williams, we stated that the circumstances to be considered when ruling on motions to transfer venue included accessibility of sources of proof, compulsory process, cost of witness attendance, possibility of a view of the premises, and other "practical problems," in addition to the statutory ground of avoiding substantial inconvenience to the parties and witnesses. Id. at 393, 389 S.E.2d at 716. We concluded that the trial court abused its discretion in failing to

10

transfer the action to Roanoke, not simply because Portsmouth had "no practical nexus" with the action, but because the railroad company met its burden of presenting "sufficient information to show good cause to transfer, including substantial inconvenience to the parties and witnesses" and other factors.  Id. at 396, 389 S.E.2d at 718.  This holding does not support the construction Virginia Power advocates - that transfer is required based solely on the lack of a practical nexus of the venue with the litigation.  We thus reject Virginia Power's argument on this issue.

Finding that the trial court did not abuse its discretion, we will affirm the trial court's denial of Virginia Power's motion to transfer venue.

### III.  Contributory Negligence

At the close of the evidence and in post-trial motions, Virginia Power sought a ruling by the trial court that the plaintiff was contributorially negligent as a matter of law. Virginia Power assigns error to the trial court's denial of these motions.

Virginia Power's burden to establish contributory negligence as a matter of law begins with the requirement that it rebut the presumption that a child between the ages of 7 and 14 does not have the capacity to understand the peril and dangers of his acts and is, therefore, legally incapable of

11

committing acts of negligence.  Norfolk & Portsmouth R.R. v.

Barker, 221 Va. 924, 929-30, 275 S.E.2d 613, 616 (1981).  This

presumption can be rebutted by showing that the plaintiff did

have the capacity to understand the peril.  Endicott v. Rich,

232 Va. 150, 156, 348 S.E.2d 275, 279 (1986).[1]  Once the

presumption was rebutted, Virginia Power had the burden to

make the traditional showing that the plaintiff's conduct

amounted to contributory negligence.  Id.  This requires

application of the objective reasonable person test, as

modified for children.  The evidence must show that the

plaintiff's conduct did not conform to the standard of what a

reasonable person of like age, intelligence, and experience

would do under the circumstances for his own safety and

---

[1] The test for rebutting the presumption focuses on the individual plaintiff.  While the opinion in Doe v. Dewhirst, 240 Va. 266, 268, 396 S.E.2d 840, 842 (1990), discusses the issue whether a reasonable person of like age, intelligence, and experience would understand the danger of his conduct under the same or similar circumstances, the holding in Dewhirst correctly states the test as whether the minor in the pending case had the capacity to understand the danger.  This test has been followed in other cases.  See Barker, 221 Va. at 930, 275 S.E.2d at 616 (stating test whether child plaintiff "had the capacity to understand the danger his conduct entailed"); Endicott v. Rich, 232 Va. at 156, 348 S.E.2d at 279 ("In order to rebut the presumption that Endicott was incapable of negligence, Rich was required to establish that in light of Endicott's age, intelligence, and experience, Endicott was capable of understanding and appreciating the nature of the danger and the peril associated with his conduct.")  In the present case, jury instruction number 11 set forth the correct test for determining the plaintiff's

12

protection.  <u>Barker</u>, 221 Va. at 929, 275 S.E.2d at 616.  Of course, the evidence must also show that the negligent conduct by the plaintiff was a proximate cause of his injury.  <u>Wright v. Norfolk & Western Ry. Co.</u>, 245 Va. 160, 170, 427 S.E.2d 724, 729 (1993).  Finally, to support the finding as a matter of law, the evidence must be such that reasonable persons could not disagree that the presumption has been rebutted and that the plaintiff was contributorially negligent.  <u>See</u> <u>Loving v. Hayden</u>, 245 Va. 441, 444, 429 S.E.2d 8, 10 (1993).

The presumption that a child between the ages of 7 and 14 is incapable of contributory negligence can be overcome by the plaintiff's own testimony showing that he had the capacity to understand the perils presented, or in fact understood them, <u>Barker</u>, 221 Va. at 929-30, 275 S.E.2d at 616; however, there was no such testimony in this case.  While plaintiff testified that he knew he was not supposed to go into the substation, he testified that the reason he was not supposed to go there was because his mother told him not to play in an area where she could not see him.  Unlike the testimony in the <u>Barker</u> case, the testimony here was insufficient to establish that plaintiff was capable of appreciating the danger of this conduct.  Therefore, we must look beyond the plaintiff's

capacity to understand the danger for purposes of rebutting the presumption.

13

testimony for other evidence of the plaintiff's capacity to understand the danger and peril of his conduct to rebut the presumption.

Virginia Power argues that the presumption was rebutted as a matter of law by the evidence that the plaintiff asked his friends to "dare" him to touch the wires in the substation even though his friends warned him of the dangers of his conduct. This statement, Virginia Power asserts, shows that the plaintiff had the capacity to understand and, in fact, did understand the "danger of his own conduct." Virginia Power also argues that the plaintiff's capacity to understand the danger was shown by the evidence that he was of above average intelligence, had passed every grade in school, scored at or above average on standardized tests, and had been taught the dangers of electricity in school. Furthermore, Virginia Power refers to the testimony of the plaintiff's friends that they understood the danger of the plaintiff's conduct. This evidence, Virginia Power asserts, both rebuts the presumption and supports the proposition that "reasonable minds cannot differ that [p]laintiff's conduct was negligent." We disagree.

First, the evidence of what the plaintiff and his friends said and did was not confined to the testimony of Ken, Kevin, and the plaintiff. Captain Timothy Zack testified that,

14

although he could hear the boys, he not only did not hear them warn the plaintiff, he also never heard the plaintiff ask his friends to dare him to do anything while he was in the substation. Second, the record also shows that the testimony of Kevin and Ken conflicted in some areas and was internally inconsistent in others. For these two reasons, their testimony cannot be considered uncontradicted. Finally, the record contains evidence that the plaintiff suffered from ADHD and that this disorder had a delaying effect on the plaintiff's development and maturation process and, thus, that James' ability to understand danger may not have been equal to that of other boys his age.

Virginia Power also asserts the principle that a plaintiff who has been expressly "warned" and who ignores those warnings is barred from recovery by his own contributory negligence, citing cases involving adults and cases involving children.[2] Virginia Power argues that the presumption was rebutted and that the plaintiff was shown to have been contributorially negligent as a matter of law in this case

---

[2] Barker, 221 Va. at 924, 275 S.E.2d at 613; Sadler v. Lynch, 192 Va. 344, 64 S.E.2d 664 (1951); Brickell v. Shawn, 175 Va. 373, 9 S.E.2d 330 (1940); Williams v. Virginia Electric & Power Co., 173 Va. 179, 3 S.E.2d 365 (1939); Templeton's Administrator v. Lynchburg Traction and Light Co., 110 Va. 853, 67 S.E. 351 (1910); Seaboard & Roanoke Railroad Co. v. Hickey, 102 Va. 394, 46 S.E. 392 (1904); McDaniel's

because the evidence showed that the plaintiff ignored "vigorous and specific danger warnings."

However, the cases cited by Virginia Power do not support the principle that a finding of contributory negligence necessarily follows when there is evidence that a warning was given. In each of the cases cited, the plaintiff was warned not to engage in a specific act, the warning was understood by the plaintiff, and in spite of the specific warning, the plaintiff performed the act and was harmed as a result of that act.

The evidence of those elements in this case is, at best, in conflict. The testimony of the plaintiff's friends that they warned him when he was in the substation is in conflict with Captain Zack's testimony that, while he could hear the boys talking, he never heard them warn the plaintiff of any danger.

There also was some conflict in the evidence as to what acts proximately caused the injuries the plaintiff sustained. Ken testified that the plaintiff was injured when he "touched something." However, Dr. H. D. Peterson, Virginia Power's witness, testified that the plaintiff's injuries were "flashover" burns, rather than a transmission injury.

---

Administratrix v. Lynchburg Cotton Mills, 99 Va. 146, 37 S.E. 781 (1901).

According to Dr. Peterson, a flashover burn is a "flame burn from an electrical short" that "[s]ometimes it sets your clothes on fire" and that at other times "just the heat from the ball of fire will do all the burning."  A transmission injury, Dr. Peterson explained, involves touching high voltage wires, allowing the current to enter the body, go through it, and exit the body.  Dr. Peterson testified that the plaintiff did not have any such entrance or exit injuries on his body.

In light of the conflicting evidence in this record, particularly regarding the evidence necessary to rebut the presumption and establish that the plaintiff had the capacity to understand the dangers of the situation, we conclude that the issue of contributory negligence was a matter for the jury.  We therefore hold that the trial court was correct in refusing to find that the plaintiff was contributorially negligent as a matter of law.

Virginia Power's assignments of error also include a claim that the trial court erred in not finding that the plaintiff had assumed the risk as a matter of law.  Virginia Power does not make a separate argument on this issue, but in a footnote, citing High v. Coleman, 215 Va. 7, 205 S.E.2d 408 (1974), Virginia Power claims that the evidence relating to the warnings plaintiff received and his alleged statement

challenging his friends to dare him to touch wires on the transformer established assumption of risk as a matter of law.

In High, however, we stated that the doctrine of assumption of risk requires showing: (1) that the nature and extent of the risk are fully appreciated; and (2) that the risk is voluntarily incurred. 215 Va. at 8, 206 S.E.2d at 409-10; see Amusement Slides Corp. v. Lehmann, 217 Va. 815, 818-19, 232 S.E.2d 803, 805 (1977); see also Young v. Lambert, 253 Va. 231, 241, 482 S.E.2d 823, 825 (1997); Norfolk & Western Rwy. v. Hodges, 248 Va. 254, 263, 448 S.E.2d 592, 596 (1994); Philip Morris Inc. v. Emerson, 235 Va. 380, 402, 368 S.E.2d 268, 280 (1988). In this case, as we have discussed, there was conflicting evidence regarding the plaintiff's capacity to understand the warnings and thus to know or fully appreciate the risk inherent in his conduct. We therefore hold that the trial court correctly denied Virginia Power's motion to find that the plaintiff had assumed the risk as a matter of law.

### IV.  Jury Instructions

Virginia Power assigns error to the trial court's granting of two jury instructions regarding the issue of contributory negligence and the trial court's denial of its proposed instruction on the duty owed a trespasser by a landowner. We consider these assignments of error in order.

## 1. Contributory Negligence Instructions

Jury Instruction 11 informed the jury that a child between 7 and 14 years of age is presumed incapable of being contributorially negligent. It instructed the jury that "[t]his is a rebuttable presumption, and you may find the plaintiff contributorially negligent, if you find by the greater weight of the evidence, considering the plaintiff's age, intelligence, maturity and experience, that the plaintiff could understand and appreciate the nature of the danger and the peril associated with his conduct." In Instruction 12, the jury was told that the conduct of a minor is to be measured by "that degree of care which a reasonable person of the same age, experience, maturity and intelligence would exercise under the circumstances of this case."

Virginia Power complains that the trial court erred when it included "maturity" as one of the elements in these instructions because "this Court's recent, unambiguous holdings" in this area have included only three factors – age, intelligence, and experience. In support of this position, Virginia Power quotes from Doe v. Dewhirst, 240 Va. 266, 268, 396 S.E.2d 840, 842 (1990), and cites Carson v. LeBlanc, 245 Va. 135, 427 S.E.2d 189 (1993); Endicott, 232 Va. 150, 348 S.E.2d 276; and Barker, 221 Va. 924, 276 S.E.2d 613.

The three factors listed above consistently appear in the opinions upon which Virginia Power relies.  However, the assertion that the language of a specific opinion dictates the content of a jury instruction from which no deviation is possible is at odds with our often-repeated caution that language in an opinion is meant to provide a rationale for a decision — and may not translate immutably into jury instructions.  See Blondel v. Hays, 241 Va. 467, 474, 403 S.E.2d 340, 344 (1991); Brown v. Commonwealth, 238 Va. 213, 221, 381 S.E.2d 225, 230 (1989); Oak Knolls Realty v. Thomas, 212 Va. 396, 397-98, 184 S.E.2d 809, 810 (1971).

The language relied on by Virginia Power referring to age, experience, and intelligence was recited by the Court in Barker in the context of the objective test for negligence.  Explaining the operation of that test when applied to children, the Court in Barker went on to say:

> Ordinarily, a less degree of care is required of an infant than an adult, but his responsibility is always to be measured according to his maturity and capacity, and determined by the circumstances of the case as shown by the evidence.  (Citations omitted) Va.-Car. Ry. Co. v. Clawson, 111 Va. 313, 316, 68 S.E. 1003, 1004-05 (1910).

221 Va. at 929, 275 S.E.2d at 616.  Thus, "maturity" has been used to describe the various factors to be considered when determining whether conduct of a minor is negligent.  Indeed, this Court in Gough v. Shaner, 197 Va. 572, 577-78, 90 S.E.2d

20

171, 175-76 (1955), specifically approved a jury instruction regarding the negligence of a 13-year-old which contained "maturity" as one of the elements to be considered.[3]  See Carlton v. Martin, 160 Va. 149, 155, 168 S.E. 348, 349-50 (1933), and cases cited therein.

Virginia Power does not discuss any of these cases, presumably because its argument is that this Court's "most recent" cases do not list "maturity" as a factor to be considered.  Based on that omission, Virginia Power concludes that the absence of the word "maturity" reflects a considered decision to eliminate maturity as a factor in cases such as these.  The basis for such omission, Virginia Power surmises, is that to include "maturity" transforms the test from an objective test to a subjective one.  This is so, Virginia Power argues, because unlike age, experience and intelligence, which they claim are concretely measurable, maturity is a subjective factor.  We disagree.

---

[3] The jury instruction approved in that case stated:

> And if the jury believe from the evidence in this case that there was no regular seat provided for him upon said motorcycle and that in riding on said motorcycle under those circumstances plaintiff's decedent, taking into account his age, general intelligence, maturity and experience, knew, or in the exercise of reasonable care for his own safety should have known, of the danger in so doing, then he was guilty of negligence.

First, to adopt Virginia Power's position requires us to draw a line between cases "recently" decided and those of more ancient vintage and ignore the latter.  Moreover, in the absence of a discussion, the omission of a single factor from a series of factors alone is insufficient to support the conclusion that the omission indicates a change in the law.

Furthermore, we reject Virginia Power's assertion that the addition of the word "maturity" transformed the objective test for negligence into a subjective test.  The difference between an objective and subjective test, in the context of negligence, is that, in an objective test, the actor's conduct is measured against what a reasonable person would do in similar circumstances, regardless of that particular actor's individual feelings, thoughts, perceptions, or prejudices.  In a subjective test, by contrast, the actor's actual knowledge and perception is the ultimate issue.

The test for negligence is always objective.  With adults, all of whom are presumed by the law to have adequate experience, intelligence, and maturity to act reasonably, the objective test is normally stated simply in terms of the reasonably prudent person.  With children, however, the law recognizes not only that they are not mature, but that not all children develop and mature at the same rate.  We, therefore,

197 Va. at 574-75, 90 S.E.2d at 174.

have repeatedly stated that a child's actions are to be judged in relation to his age, experience, intelligence, and maturity.  Barker, 221 Va. at 929, 275 S.E.2d at 616; Grant v. Mays, 204 Va. 41, 45, 129 S.E.2d 10, 13 (1963).

While these factors require a greater focus on the characteristics of the individual whose actions are in question, and while the focus on that individual's characteristics becomes greater with the addition of every factor to be included, consideration of these factors does not transform the test into a question of what the actor actually knew and perceived, and thus does not transform the test from an objective to a subjective one.  The test remains objective because the fact finder still must determine what a reasonable person with like characteristics would do in similar circumstances.

Having the jury consider plaintiff's maturity in determining the reasonableness of his conduct is in line with the general proposition that a child's actions are to be measured in light of the child's age and experience.  While we do not require or suggest that the element of maturity be included in jury instructions in all cases, we believe the trial court did not err in including that element for consideration in the jury instructions in this case.

23

Accordingly, we reject Virginia Power's assertion that the trial court erred in including the word maturity in the instructions on contributory negligence, Instructions 11 and 12.

## 2. Trespass Instruction

The trial court refused to give a jury instruction offered by Virginia Power which stated that if the plaintiff was a trespasser, Virginia Power's only duty was "to do him no intentional or willful injury" (trespass instruction). Virginia Power assigns error to the trial court's denial of this trespass instruction, contending that the trial court's stated reason for refusing it was erroneous and arguing that refusing the trespass instruction "improperly imposed a higher duty of care on Virginia Power."

Virginia Power first argues that the trial court rejected the trespass instruction because the trial court erroneously believed that it did not apply in cases involving children. The source of this argument is the following statement made by the trial court in the course of the discussion on whether to grant the trespass instruction:

> I'm going to do this, right or wrong, over the defendant's objection. The tendered instruction about trespassing is refused because this child — this case being a child, that trespass instruction does not apply.

However, as discussed below, a fair and complete reading of the record does not support Virginia Power's assertion that the trial court rejected the trespass instruction solely because it concluded that such an instruction does not apply in cases involving children.

When the trial court began consideration of the trespass instruction, the plaintiff indicated that he intended to offer another instruction which he claimed "negated" Virginia Power's trespass instruction. Plaintiff's instruction was based on the principle discussed in Daugherty v. Hippchen, 175 Va. 62, 65-66, 7 S.E.2d 119, 120-21 (1940), that an owner of a dangerous instrumentality who knows or should know that children would be playing in the area of the instrumentality owes a proper degree of care to such children, even if the children are trespassers (the dangerous instrumentality instruction). Virginia Power responded that the rule as stated in its trespass instruction applies to children as well as adults and that Daugherty was distinguishable and does not apply in this case. The trial court rejected Virginia Power's arguments attempting to distinguish Daugherty and suggested a single instruction that would inform the jury both of the general rule of a land owner's duty to a trespasser and of the exception to that rule as discussed in Daugherty. Virginia

25

Power adamantly objected to any changes or additions to its trespass instruction.

Plaintiff and Virginia Power then engaged in a lengthy exchange with the trial court regarding the substance of a single instruction on these subjects but could not reach any agreement. Virginia Power rejected a "combined instruction" offered by the plaintiff which would have included Virginia Power's proposed trespass instruction and the dangerous instrumentality instruction, steadfastly maintaining that it was entitled to its trespass instruction "stand[ing] alone."

Unable to persuade Virginia Power to alter its proposed trespass instruction to conform to the trial court's view of the law under the circumstances of this case, the trial court denied the trespass instruction as proposed by Virginia Power and made the statement quoted above.

This review of the record shows that the dispute over the trespass instruction centered not on whether the trespass instruction applied to children per se, but on whether the principle set out in Daugherty applied in this case and, if so, how to craft an instruction which would accurately reflect both that principle and the duty of care owed to a trespasser. The trial court determined that, considering the evidence, the principle expressed in Daugherty was applicable. In light of Virginia Power's continued objection to adding any language

26

which would incorporate the principles stated in Daugherty, the trial court finally rejected the trespass instruction as offered. A complete review of the record thus reveals that the trial court did not refuse the trespass instruction on the sole ground that it simply did not apply to children, and we accordingly reject Virginia Power's argument that it did so.

Virginia Power next argues that the trespass instruction should have been given as offered because it does apply to children in general and to the plaintiff in this case. Daugherty is distinguishable, Virginia Power contends, and the trial court should not have attempted to incorporate it into the trespass instruction.

We agree with Virginia Power that a child trespasser can be subject to the general rule for the duty of care by landowners to trespassers; however, we also agree with the trial court that Daugherty was applicable under the facts of this case and that instructing the jury on the duty to trespassers as proposed by Virginia Power would have given the jury an inaccurate and incomplete instruction on the law.

In Daugherty, an eight-year-old boy was injured when he took some blasting caps from a shed in the back yard of the home his family leased from the owner of the shed. The owner knew that children played in the yard. Neither the box holding the blasting caps nor the door to the shed was locked.

27

The defendant asserted, as Virginia Power does here, that he was not liable for the child's injuries because the child was a trespasser and stole the blasting caps. The Court in Daugherty rejected this position, stating:

> There may be cases of trespassers who are not entitled to a recovery for injuries sustained from explosives while unlawfully on the premises of another unless wantonly inflicted, but this rule has no application where children of immature years are concerned. The courts throw a safeguard around such children to protect them in their childish instincts from the dangerous nature of explosives of which they have no proper understanding. This is especially true where the keeper of explosives knows, or should know, that children of tender years play or are likely to play around the storehouse. Liability may exist where a child of tender years is involved and not exist in the case of a child of more mature years.
> The general rule seems to be that, even if an immature child is a trespasser, one who stores explosives or has control of other dangerous instrumentalities is not relieved of the duty of exercising a proper degree of care for his protection. If the one who keeps explosives is negligent in leaving them in a place accessible to children who he knows or should know are accustomed to play nearby, the fact that the child is a trespasser will not relieve the owner from liability. The same is true as to other dangerous instrumentalities.

175 Va. at 65-66, 75 S.E.2d at 120-21. The evidence in this case implicated the principles quoted above, and, thus, we cannot say that the trial court abused its discretion in rejecting the trespass instruction as it was offered by Virginia Power.

28

Virginia Power raises a number of other arguments in support of its position that its trespass instruction should have been given, none of which, however, require reversal of the trial court's ruling. First, Virginia Power points to the fact that plaintiff proposed a combined instruction on trespass and the dangerous instrumentality principles and asserts that the plaintiff thereby conceded that Virginia Power was entitled to the trespass instruction. However, as discussed above, plaintiff's "concession" was qualified by his position that the trespass instruction had to be modified to take into account the principles expressed in Daugherty.

Next, Virginia Power argues that the trial court erred because it not only refused to give the trespass instruction but also gave "instructions that improperly imposed a higher duty of care on Virginia Power." Virginia Power is apparently referring to Instruction 4 which instructed the jury that Virginia Power, as a producer of electricity, was required to "use a high degree of care commensurate with the danger involved to prevent injury to others." According to Virginia Power, such "mis-instruction clearly prejudiced" Virginia Power by imposing a "greater duty upon Virginia Power than was appropriate in this case," requiring, at a minimum, a new trial. We disagree.

29

Virginia Power did not argue in the trial court and does not assert now that Instruction 4 was an inaccurate statement of the law. The only objection made to Instruction 4 at trial was that it should not be given without the trespass instruction.

However, Virginia Power's claim of prejudice fails by virtue of Virginia Power's actions in offering Instruction 6, referred to by the parties as "the joint instruction." Following the impasse reached on the trial court's request for an amended trespass instruction, the plaintiff and Virginia Power jointly offered Instruction 6, which told the jury that Virginia Power was negligent if it did not comply with the National Electrical Safety Code in operating, constructing, or maintaining the substation, or if Virginia Power had notice of circumstances at the substation making it reasonably foreseeable that the plaintiff would enter the substation. [4]

---

[4] Instruction 6 stated:

> To establish that Virginia Power was negligent, Plaintiff must prove by a preponderance of the evidence that Virginia Power's methods of constructing, operating, or maintaining the Q Substation were not in accordance with the National Electrical Safety Code, or that Virginia Power had notice of circumstances at Q Substation such that it was reasonably foreseeable that Plaintiff would enter Q Substation.
>
> If you find that Virginia Power met the National Electrical Safety Code and that Virginia Power did not have notice of circumstances at Q Substation such that it was reasonably foreseeable that Plaintiff would enter Q

First, this instruction allowed the jury to find Virginia Power negligent, without regard to any standard of care, simply upon a finding that specific facts existed – non-compliance with the National Electrical Safety Code or notice of certain circumstances, and that these conditions caused plaintiff's injuries.  Furthermore, during the debate over jury instructions, Virginia Power represented to the trial court that the "high degree of care" referred to in Instruction 4 was specifically defined in Instruction 6, the joint instruction, as the duty to comply with the National Electrical Safety Code.  Virginia Power thus will not be heard now to complain that Instruction 4 imposed an improperly high duty of care and resulted in prejudice to Virginia Power. Accordingly, we find no error in the trial court's refusal to give Virginia Power's proposed trespass instruction.

## V.  Expert Testimony

---

Substation, then Virginia Power is not liable to Plaintiff.

If, however, you find that Virginia Power did not meet the National Electrical Safety Code or that Virginia Power did have notice of circumstances at Q Substation such that it was reasonably foreseeable that Plaintiff would enter Q Substation, you may find Virginia Power liable only if you also find that (i) any negligence by Virginia Power was a proximate cause of Plaintiff's injuries and (ii) the evidence fails to prove by a preponderance of the evidence that Plaintiff's own negligence or assumption of the risk was a proximate cause of his injuries.

Virginia Power sought to elicit testimony from its expert, Dr. James Culbert, a child psychologist, that a child of similar age, intelligence, and experience to the plaintiff would have understood the dangers of an electrical substation. The trial court excluded such testimony on the ground that the jury did not need the assistance of expert testimony to reach a conclusion on that issue. Virginia Power assigns error to this ruling, arguing that its expert testimony was necessary to assist the jury in this case because "many of the jurors did not have children" and "none of the jurors was from an urban environment like Richmond."

The admission of expert testimony is committed to the sound discretion of the trial court, and this Court will reverse a trial court's ruling only where that court has abused its discretion. Tarmac Mid-Atlantic, Inc. v. Smiley Block Co., 250 Va. 161, 166, 458 S.E.2d 462, 465 (1995). An expert's opinion is admissible in evidence if it will assist the trier of fact on a matter that is not within the range of common knowledge. David A. Parker Enterprises, Inc. v. Templeton, 251 Va. 235, 237, 467 S.E.2d 488, 490 (1996); see Code § 8.01-401.3(A). As a corollary, an expert's testimony is inadmissible if it relates to matters about which the fact finder is equally as capable as the expert of reaching an

intelligent and informed opinion.  <u>Kendrick v. Vaz, Inc.</u>, 244 Va. 380, 384, 421 S.E.2d 447, 449 (1992).

In this case, the plaintiff's experts, Langford and Dr. Tsao, testified that plaintiff's ADHD condition and other life circumstances affected his developmental and intellectual processes to the extent that he acted like a child significantly younger and less intelligent than he.  Virginia Power attempted to rebut this testimony through its own expert, Dr. Culbert, who testified that the plaintiff did not have ADHD and was of average intelligence for his age.

The jury having been so informed by the experts, we cannot say that the trial court abused its discretion in concluding that the jury was capable of drawing its own conclusion, from the facts and circumstances of the case, on the question whether children of similar age, intelligence, and experience to the plaintiff would have understood the electrical dangers.  As the trial court pointed out, the jurors could draw on their experiences having once been children themselves, having children of their own, having grandchildren, nieces, nephews, or neighbors and friends with children.

Furthermore, although Virginia Power asserts that "many" of the jurors did not have children, the record reflects that only five of the 18 members of the venire did not have

children, and the record does not indicate how many of those five ultimately served on this jury. Likewise, while the record reflects that each of the members of the venire met the six-month residency requirement for serving on the jury in Charles City County, the record does not support Virginia Power's conclusion that "none" of them was "from" an urban environment or had no experience in such an environment. In any event, although the jurors may not have had personal experience with children suffering from ADHD, or children raised in the inner city, they received extensive information through the expert testimony as to the effect such circumstances have on a child's maturity, intelligence, and experience.

Virginia Power also complains that the trial court improperly restricted its cross-examination of plaintiff's expert, Dr. Tsao. As we read the argument, Virginia Power first states that the trial court did not allow it to cross-examine Dr. Tsao on the issue whether a child of like age, intelligence, and experience as the plaintiff would have understood the danger, "even though the trial court allowed [Dr. Tsao] to give opinions on the matter in his direct testimony." Virginia Power continues by asserting that Dr. Tsao also testified on direct examination regarding the plaintiff's ability to appreciate the danger but was not

34

allowed to be cross-examined on that issue either.  Neither of these assertions, however, is supported by the record.

The trial court specifically ruled that both parties' experts could testify about the effects of ADHD and other circumstances on a child's maturity, intelligence, and experience, but that neither could opine as to whether the plaintiff, or a child like him, could understand the peril associated with the substation.  The trial court held that allowing the experts to give their opinion on this issue would invade the province of the jury.  In conformity with the trial court's ruling, the plaintiff did not elicit opinions on either issue from Dr. Tsao on direct examination.[5] Consequently, asking Dr. Tsao for such opinions on cross-examination would have been beyond the scope of the direct examination and would not have been proper impeachment.

For these reasons, we find no error in the trial court's exclusion of this expert testimony.

VI.  Admission of Photographs

---

[5] The record is not conclusive as to what Dr. Tsao would have said on cross-examination if asked his opinion on this subject.  Virginia Power proffered as Dr. Tsao's likely response to such a question the response Dr. Tsao gave during his deposition; however, the parties' interpretation of that response is disputed.  Indeed, the plaintiff objected to the form of the proffer, suggesting that Dr. Tsao be allowed to explain his answer for the record.

35

Virginia Power asserts that the trial court erred in admitting four particular photographs into evidence. The photographs variously showed holes or gaps under the fence in two locations other than the one plaintiff alleged he used to enter the substation, a slit in the fabric of the fence approximately eight inches long and almost ten feet from the place at which the plaintiff allegedly entered the substation, the condition of the barbed wire on the side opposite where the plaintiff entered, and vines growing on the fence. Admission of these photographs was error, Virginia Power asserts, because the defects in the fence shown in the pictures "played no role in [plaintiff's] injuries" and were, therefore, irrelevant. We disagree.

The fact that the defects depicted in these photographs were not a proximate cause of plaintiff's injuries does not preclude their relevance in this case. Every fact, however remote or insignificant, that tends to establish the probability or improbability of a fact in issue is relevant. Ravenwood Towers, Inc. v. Woodyard, 244 Va. 51, 56, 419 S.E.2d 627, 630 (1992).

In this case, the plaintiff alleged that Virginia Power negligently failed to properly inspect the fence and failed to discover the hazard created by such an improperly maintained fence. Plaintiff alleged that these negligent acts made it

easy for children to crawl under the fence and thus proximately caused plaintiff's injuries.

In opening statements to the jury, Virginia Power told the jury that it would prove that it had no notice of any defects in the substation because it had conducted a thorough inspection of the substation on July 8 and 9, 1996 and found no defects in the fencing. The condition of the fencing surrounding the substation at the time of the purported inspection, whether Virginia Power adequately inspected the fencing, and whether Virginia Power had notice of the defects in the fencing that caused plaintiff's injuries were thus disputed issues in the case.

During plaintiff's case in chief, Captain Zack testified that the challenged pictures adequately represented the way the substation appeared in May and June of 1996, prior to the accident. These images were relevant in that they tended to show that the condition of the fence surrounding the substation was such that the fence would not have passed proper inspection, and that Virginia Power should have known that defects in the fencing existed that would allow children to enter the substation.

Furthermore, the trial court guarded against the jury's potential misunderstanding or misuse of this evidence by giving them the following limiting instruction:

37

> [the photographs] are introduced not because they're
> the site where the young man went over or under the
> fence, but these are photographs . . . to introduce
> the general appearance of the entire fence line.
> This is from the evidence not where the young man
> went through.  This shows the general condition of
> the fence line.  And for that reason only are you to
> consider the photographs.

For the foregoing reasons, we affirm the trial court's
admission of these photographs into evidence.

### VII.  Failure to Set Aside the Verdict or Order Remittitur

Following the jury's verdict of $20,000,000, Virginia
Power made a motion asking the trial court to set aside the
verdict or alternatively to order remittitur to "under a
million dollars."  Virginia Power argued to the trial court
that the verdict was excessive and should be either vacated or
reduced because, even though the plaintiff suffered painful
burns and was scarred for life, he was not injured in such a
manner that would curtail his life activities.  According to
Virginia Power, "he's up and about.  He can see.  He's got
both his arms and legs.  He can play basketball."

Virginia Power attributes the amount of the verdict to a
misunderstanding by the jury caused by a statement made by
plaintiff's counsel in closing argument that plaintiff was
reducing his damage request from $150,000,000 to $75,000,000
because he "elected" not to introduce any medical bills.
Virginia Power argues that this statement misled the jury into

thinking that the plaintiff in fact had medical bills to pay, thus leading the jury to award more damages than were supported by the evidence at trial.[6]

The trial court denied Virginia Power's motion, reasoning that the verdict was supported by the evidence and was not excessive. The trial court specifically remarked that the jury had calmly listened to all of the evidence and had simply rejected Virginia Power's evidence. Virginia Power assigns error to this ruling.

A jury verdict fairly rendered on competent evidence should not be disturbed by the trial court; however, the trial court does have the duty to correct a verdict that plainly appears to be unfair or would result in a miscarriage of justice. Edmiston v. Kupsenel, 205 Va. 198, 202, 135 S.E.2d 777, 780 (1964); Smithey v. Sinclair Refining Co., 203 Va. 142, 145-46, 122 S.E.2d 872, 875 (1961). Whether to set aside a verdict as excessive is within the discretion of the trial court, and, on appeal, the standard of review is whether the trial court abused its discretion. Poulston v. Rock, 251 Va. 254, 258-59, 467 S.E.2d 479, 481-82 (1996).

Based on this record, we cannot say that the trial court abused its discretion. Although Shriners Hospital treated the

---

[6] We note that Virginia Power did not object to this statement during plaintiff's closing argument.

plaintiff at no charge, and plaintiff offered no evidence of special damages, the evidence of the plaintiff's past, present, and future pain and suffering was compelling.

Plaintiff sustained third degree burns to his head, face, neck, arms, hands, and chest.  While in the hospital after the accident, plaintiff endured eight surgical operations in which doctors took skin from "donor sites" and grafted it onto the burned areas of plaintiff's body.  Nursing procedures to keep the wounds clean were so painful and traumatic that the plaintiff had to be sedated.

Following his release from the hospital, plaintiff returned to the hospital intermittently to have skin grafts applied to rips and cracks in the hypertrophic scarring that developed over his burns.  Dr. Glenn Donald Warden, the reconstructive surgeon specializing in burns who treated the plaintiff after the accident, testified that this hypertrophic scarring would cause bumpy, hyperpigmented skin that would continually shrink as it healed, and that plaintiff would have to wear elastic spandex-like garments and gloves for one to one and one-half years after the skin graft surgeries in order to minimize scarring.  Dr. Warden further testified that the hypertrophic scarring causes a loss of range of motion, especially in teenagers, requiring extensive exercise and physical therapy.  On one occasion, while doing stretching

exercises pursuant to his doctor's instructions, plaintiff tore scar tissue and had to return to the hospital to have skin regrafted onto his elbow.  Dr. Warden testified that, as plaintiff continues to grow, he will need at least eight additional reconstructive procedures to add skin grafts to the scar tissue.

Plaintiff presented evidence that, beyond the physical pain, the accident has caused and will continue to cause substantial emotional and psychological pain related to his permanent disfigurement.  Dr. Tsao testified that James suffers from post-traumatic stress disorder as a result of the accident and that he will require professional treatment for at least the next 30 years to deal with the depression, anger, and frustration caused by his attempts to cope with his permanent injuries.

Furthermore, the jury had an opportunity to hear from and view the plaintiff when he testified.  Plaintiff testified that the children at school tease him and that he is ashamed of his appearance.  He testified that on one occasion, when he asked someone for directions, that person "looked at me and ran."

As this Court has stated before, there is no exact method by which to measure and value in monetary terms the degree of pain and anguish of a suffering human being, and, unless the

41

jury's verdict is so great as to indicate its judgment was actuated by partiality or prejudice, the court should not disturb the verdict.  Norfolk Rwy. & Light Co. v. Spratley, 103 Va. 379, 49 S.E. 502 (1905).

We believe that in view of the evidence in the record, including the evidence described above, the trial court did not abuse its discretion in concluding that the jury's verdict was not excessive.  Accordingly, we affirm the trial court's denial of Virginia Power's motion to set aside the verdict or order remittitur.

For the foregoing reasons, the judgment of the trial court will be affirmed.

Affirmed.