896 F.Supp. 548 (1995)
Patricia S. MEARS, Plaintiff,
v.
GENERAL MOTORS CORPORATION, Defendant.
No. 2:94cv250.
United States District Court, E.D. Virginia, Norfolk Division.
March 14, 1995.
*549 Robert John Haddad, Thomas Brady Shuttleworth, II, Shuttleworth, Ruloff, Giordano & Kahle, P.C., Virginia Beach, VA, for plaintiff.
Benjamin Verbin Madison, Gregory N. Stillman, Hunton & Williams, Norfolk, VA, Donald Paul Boyle, Jr., Joseph Conrad Kearfott, Hunton & Williams, Richmond, VA, for defendant.

OPINION AND ORDER
MILLER, United States Magistrate Judge.
The plaintiff, Patricia S. Mears, brought this action seeking compensation for harm caused by an accident involving a General Motors vehicle. This matter comes before the Court on the motion of defendant General Motors Corporation (GM) for summary judgment.
Both parties have consented to have all proceedings in this case conducted before a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73. After a review of the memoranda submitted by the parties, and the applicable statutory and case law, the Court GRANTS the motion for summary judgment.

I. FACTUAL AND PROCEDURAL BACKGROUND

Both parties are in accord on all material facts. Plaintiff Patricia Mears was badly injured on March 4, 1992, when a GM pickup truck hit the side of her car at the intersection of State Route 606 and U.S. 13 on Virginia's Eastern Shore.[1] The Chevrolet C-60 medium duty pick-up truck, manufactured by GM in 1966, was unable to stop at the intersection due to brake failure. The parties agree that a contributing cause of the accident was the fact that brake fluid had leaked from the braking system of the GM truck, and, as a result, the driver of the truck lost the use of the brakes at the critical moment before entering the intersection. Plaintiff alleges that GM is liable for her injuries because GM did not install a more advanced braking system in the pick-up truck when the truck was manufactured in 1966.
The braking system on the truck, and not the circumstances surrounding the accident, form the core of this lawsuit and this motion. Thus, a brief mechanical explanation is in order. In general, a hydraulic braking system makes use of brake fluid pressure to operate the brakes of a vehicle. A single hydraulic brake system has a master cylinder with one reservoir which provides brake fluid pressure to all of the wheel cylinders. By contrast, a split hydraulic system contains a master cylinder with two independent pressure systems which supply different groups of wheel cylinders. The difference between the two systems most pertinent here is the performance in the case of a catastrophic leak of the brake fluid. Loss of fluid in a single hydraulic brake system can disable the brakes entirely, while the same event in a split hydraulic system may not, as braking capacity might not be lost in the portion of the system in which the leak did not occur. Therefore, the split hydraulic system may offer a safety advantage in some circumstances.
Both parties also agree that the split system existed in theory as early as the 1920s, and that a version of the split system was used in some European vehicles, including medium duty trucks, by the late 1950s. GM used the split system on several vehicles in *550 the 1960s, including Cadillacs. However, in 1966 no medium duty trucks sold by domestic manufacturers used anything other than the single brake system.
This matter comes before the Court on GM's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.
Plaintiff Mears filed her original complaint on March 2, 1994, and GM answered on August 5, 1994. GM subsequently filed this motion for summary judgment with a memorandum in support of the motion on February 1, 1995. Mears filed a memorandum in opposition to the motion on February 13, 1995, and GM responded with a reply brief in support of its motion for summary judgment, filed on February 16, 1995. The undersigned heard oral argument on this matter on February 24, 1994.

II. STANDARD FOR A SUMMARY JUDGMENT MOTION

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). For the evidence to present a "genuine" issue of material fact, it must be "such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Facts are deemed material if they might affect the outcome of the case. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In other words, the moving party's submission must foreclose the possibility of the existence of facts from which it would be open to a jury to make inferences favorable to the non-movant. Id.
In deciding a summary judgment motion, the court must view the record as a whole and in the light most favorable to the non-moving party. Terry's Floor Fashions, Inc. v. Burlington Indus., Inc., 763 F.2d 604, 610 (4th Cir.1985). Either party may submit as evidence "pleadings, depositions, answers to interrogatories, and admissions on file, together with ... affidavits" to support or rebut a summary judgment motion. Fed. R.Civ.P. 56(c). Supporting and opposing affidavits must be based on personal knowledge and must set forth facts that would be admissible in evidence. Id. at 56(e). Furthermore, the party moving for summary judgment need not supply "affidavits or other similar materials negating the opponent's claim." Celotex, 477 U.S. at 323, 106 S.Ct. at 2553.
Rule 56 mandates a grant of summary judgment against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322, 106 S.Ct. at 2552. The party who bears the burden of proving a particular element of a claim must "designate `specific facts showing that there is a genuine issue for trial'" with respect to that element. Id. at 324, 106 S.Ct. at 2553 (quoting Fed.R.Civ.P. 56(e)).
When a motion for summary judgment is made and supported by affidavits as provided for in Rule 56, an adverse party may not rest upon mere allegations or denials of the moving party's pleadings. Rather, the rule requires the nonmoving party's response, by affidavits or as otherwise provided for in Rule 56, to set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment if appropriate, should be entered against the nonmoving party. Fed.R.Civ.P. 56(e); Atkinson v. Bass, 579 F.2d 865, 866 (4th Cir.1978).
In addition, the opposing party is entitled under Rule 56(f) to set forth in an affidavit reasons why he is presently unable to present by evidentiary affidavit facts essential to justify his opposition. Fed.R.Civ.P. 56(f); Atkinson, 579 F.2d at 866. If the reasons are adequate, the trial judge has broad discretion to determine whether to deny the motion for summary judgment, order a continuance, or make some other just disposition. Id.
With these controlling principles in mind, the Court turns to the merits of the motion.

III. ANALYSIS

The core issue in this case is whether a truck, manufactured in 1966, can be considered *551 "unreasonably dangerous" when the manufacturer used a single hydraulic braking system rather than a safer alternative. The answer to this question hinges on a number of clearly delineated factors set forth by the Virginia Supreme Court and the Fourth Circuit Court of Appeals.
Under Virginia law, in order to show that General Motors has designed an unreasonably unsafe product, the plaintiff must prove the following elements: (1) the product contained a defect which rendered it unreasonably dangerous for ordinary or foreseeable use; (2) the defect existed when the product left the defendant's hands; and (3) the defect actually caused plaintiff's injury. Marshall v. H.K. Ferguson Co., 623 F.2d 882, 885 (4th Cir.1980) (citing Logan v. Montgomery Ward & Co., 216 Va. 425, 219 S.E.2d 685 (1975)); see also Alevromagiros v. Hechinger Co., 993 F.2d 417, 420-21 (4th Cir. 1993) (reiterating these elements as the law in Virginia).
In order to satisfy the first element of the tort  to determine whether a product contained a defect which rendered it unreasonably dangerous  courts have pointed to three criteria: (1) government standards; (2) industry standards; and (3) consumer expectations. Sexton v. Bell Helmets, Inc., 926 F.2d 331, 337 (4th Cir.) (applying Kentucky law), cert. denied, 502 U.S. 820, 112 S.Ct. 79, 116 L.Ed.2d 52 (1991); Alevromagiros, 993 F.2d at 420.
Before applying these criteria to the facts of this case, the Court notes three important limitations. First, the relevant standards and expectations are those existing when the truck was manufactured in 1966. As stated in Sexton,
In short, a product can only be defective if it is imperfect when measured against a standard existing at the time of sale or against reasonable consumer expectations held at the time of sale.... We cannot, under the law, judge yesterday's design by contemporary standards or expectations.
926 F.2d at 337-38.
Second, although the experts of the parties may disagree on several points, this alone does not preclude this Court from evaluating and deciding this motion. As noted in Alevromagiros,
The credibility of competing experts is a question for the jury only if the party with the burden of proof has offered enough evidence to sustain a verdict in its favor. See Lust v. Clark Equipment Co., 792 F.2d 436, 438-39 (4th Cir.1986).
993 F.2d at 421. Further, "[h]indsight opinions by ... experts suggesting that more should have been done ... are insufficient to discredit the conclusion" that the manufacturer acted properly. Doe v. Miles Laboratories, Inc., Cutter Laboratories Div., 927 F.2d 187, 193 (4th Cir.1991).
Third, the fact that a safety improvement was available or technologically feasible at the time of the accident is of no consequence. The view of the Fourth Circuit on this point is crystal clear:
[P]roof that technology existed, which if implemented could feasibly have avoided a dangerous condition, does not alone establish a defect.... Thus, for example, automobiles in the 1950s were manufactured without seat belts, even though the technology was available for their installation. Yet ... we would not now impose liability on the manufacturer of those automobiles on the basis that they were defective for not having seat belts.
Sexton, 926 F.2d at 336. In addition, "[t]he product need not incorporate the best or most highly-advanced safety devices." Marshall, 623 F.2d at 886. Against the backdrop of these important considerations, we turn to the specific criteria enunciated by the courts.

A. Government Standards

Plaintiff concedes that no federal or state government regulation mandated the use of the split braking system on this type of vehicle (or, for that matter, on any other type of vehicle) in 1966.[2] Although plaintiff *552 is able to identify regulations promulgated after 1966, as noted earlier, these are inapposite.

B. Industry Standards

Plaintiff does not contest defendant's assertion that the Society of Automotive Engineers (SAE) was the leading industry group of the automotive manufacturing industry in 1966. The SAE had established both Standards and Recommended Practices relating to brake systems and brake components on medium duty trucks. Significantly, no SAE Standard or Recommended Practice required or suggested that split brake systems be used on medium duty trucks.
Combined with the fact, noted earlier, that no other medium duty truck on the market used anything other than the single braking system, the unavoidable conclusion is that the industry itself neither mandated nor supported the use of this advanced type of braking system on medium duty trucks.
Plaintiff counters with several arguments. First, plaintiff argues that a study done by several SAE engineers indicates the existence of a standard. Second, plaintiff contends that the relevant industry standard should include overseas manufacturers. Third, plaintiff argues that the industry cannot be relied upon to produce standards when the focus of the business is to maximize profits.
The Court will address plaintiff's contentions seriatim. First, while the Court acknowledges the existence and content of the study cited by plaintiff, it does not agree that this document is sufficient to establish an industry standard. The study, entitled "Split Systems for Commercial Vehicle Hydraulic Brakes" was prepared by employees of the Bendix Corporation, and apparently presented at an SAE conference in 1964. The study is not a publication of SAE, but is merely a recitation of the ideas of SAE members.
Second, the Court concludes that the relevant industry is that of domestic manufacturers of medium duty trucks. The practices of foreign producers simply has no place in the calculus of the industry standards. This fact was recognized in Doss v. Apache Powder Co., 430 F.2d 1317 (5th Cir. 1970), where the court rejected the plaintiff's attempt to include Canadian standards and customs in a products liability lawsuit.
In addition, as the Fourth Circuit made clear in Dreisonstok v. Volkswagenwerk, A.G., 489 F.2d 1066, 1075 (4th Cir.1974),
It is entirely impermissible to predicate a conclusion of negligent design simply because a vehicle, having a distinctive purpose, such as the microbus, does not conform to the design of another type of vehicle, such as a standard passenger car, having a different nature and utility.
Third, the Court does not share the pessimistic view of plaintiff regarding the industry's creation of its own standards. As the court noted in Sexton:
It is, no doubt, significant when no one in an industry manufactures a product in a manner that a plaintiff claims is required. While conformity with industry practice is not conclusive of the product's safety, because an industry could adopt a careless standard, the cases where a member of an industry will be held liable for "failing to do what no one in his position has ever done before" will be infrequent.
Sexton, 926 F.2d at 336 (citations omitted), quoting W. Prosser, Handbook on the Law of Torts § 33, at 167 (4th ed. 1971).

C. Consumer Expectations

Defendant argues that consumers clearly expected manufacturers to use only the single braking system on medium duty trucks. According to defendant, the consumer preference for the single braking system was rooted in lower initial costs and lower maintenance costs.
As support for this assertion, defendant relies on the opinions of several individuals, including a former automotive engineer with United Parcel Service (UPS).[3] According to *553 this engineer, UPS was a large-scale purchaser of medium duty trucks, and had evaluated the efficacy of purchasing trucks with split braking systems. Based on a number of factors, UPS determined that the additional costs were not warranted, and, therefore, UPS chose to remain with the single braking system.
In addition, GM notes that it offered medium duty trucks with the split braking system during the 1970s, but that consumer demand for this feature was extremely limited.
Plaintiff argues that consumers were not in a position to know what was best for them, and that if the industry had been forthright about the benefits of the split braking system, consumer demand would have been altered considerably.
However, as the court stated in Sexton:
It is perhaps more significant [than the fact that no one in an industry manufactures a product in the manner that a plaintiff claims is required] that a reasonable purchaser does not demand or expect that the product incorporate a particular aspect of design.
Sexton, 926 F.2d at 336.

D. Conclusion

The decisions of the Fourth Circuit and the Virginia Supreme Court detailing these critical factors are based on sound policy. As stated in defendant's brief to the court,
[Adoption of plaintiff's argument would imply that] tens of thousands of medium duty trucks that are legally on the roads today with single braking systems ... are `unreasonably dangerous.' It means that hundreds of thousands of motor vehicles that are sold annually without unquestioned safety improvements such as air bags or antilock braking systems are `unreasonably dangerous.'
Def.'s Mem. in Supp. of Summ. J. at 23. The requirements set forth by the courts ensure that only when the product in question is measured against concrete standards and expectations, and falls short of these criteria, can it be found to be unreasonably dangerous. Indeed, as the court in Sexton noted:
While society demands and expects a reasonably safe product, an examination of societal standards at any given point in time usually reveals an expectation that balances known risks and dangers against the feasibility and practicability of applying any given technology.
Sexton, 926 F.2d at 337.
Because these three critical factors all support a finding that the truck in question was not unreasonably dangerous, this Court must conclude that the plaintiff is unable to establish the first element of the tort: Plaintiff cannot prove that the 1966 Chevrolet C-60 medium duty pick-up truck was defective as to render it unreasonably dangerous.

IV. CONCLUSION

For the foregoing reasons, the Court concludes that General Motors, Incorporated's motion should be GRANTED. Therefore, the Court GRANTS the motion for summary judgment and orders the Clerk to enter judgment in favor of the defendant, General Motors Corporation.
NOTES
[1] The GM truck was driven by Rodney Tazwell, owned by Robert Scott, and serviced by others. These individuals were defendants in a lawsuit brought by Mears in the Circuit Court of Northhampton County. Mears recovered a combined settlement of $505,000 from these defendants.
[2] The first federal standard to require split hydraulic brakes on vehicles sold to the general public did not come into existence until March 2, 1967, when the National Highway Traffic Safety Administration issued Initial Federal Motor Vehicle Safety Standard 105. See 32 Fed.Reg. 2,408 (1967). This regulation applied only to passenger cars. Only in 1983 did the federal government begin to require split braking systems on medium trucks.
[3] The level of consumer expectations can be established through "evidence of actual industry practices, ... published literature, and from direct evidence of what reasonable purchasers considered defective." Sexton, 926 F.2d at 337.